*EXHIBIT "A"*

## COLLABORATIVE RESEARCH AGREEMENT

**THIS COLLABORATIVE RESEARCH AGREEMENT** (the **"Agreement")** is entered into as of the 1ˢᵗ day of January, 2020 (the **"Effective Date")** by and between **Tassili Life Sciences Corp.**, a body corporate formed under the Ontario *Business Corporations Act* (the "**Company**"), with a registered office located at 200-366 Bay St., Toronto, ON, M5H 4B2 and **University of Miami, a not-for-profit corporation** having an office at 1320 S. Dixie Highway, Gables One Tower #650, Locator Code 2960, Coral Gables, FL 33146 (the **"Institution").** Each of Company and Institution are sometimes referred to herein as a **"Party"** or, jointly, as the **"Parties."**

**WHEREAS,** the Parties each possess certain resources, expertise and technology necessary for research projects in the fields of treatment of post traumatic stress disorder ("PTSD") and/or traumatic brain injury with PTSD ("TBI-PTSD"); and

**WHEREAS,** the Parties desire to collaborate during the Term (as hereinafter defined) in connection with various pre-clinical research initiatives for the Company (the **"Project)** under this Agreement; and

**WHEREAS,** Dr. Michael Hoffer, an employee of Institution will direct, manage, develop and coordinate the Project on behalf of Institution ("Project Manager"); and

**NOW, THEREFORE,** in consideration of the mutual promises and covenants contained herein, and intending to be legally bound hereby, the Parties agree as follows:

1     **Collaborative Research Plan.**

     1.1     Each of the Parties agrees to use its reasonable efforts to conduct research and development to evaluate and further develop for commercial applications, certain targeted therapeutics identified or otherwise characterized hereunder, with the assistance, cooperation and guidance of a dedicated team. The Project shall be conducted in accordance with the statement of work attached hereto and made a part hereof as **Exhibit A** (the **"Statement of Work").** The Statement of Work outlines the proposed research as well as proposed timelines and funding of research to be undertaken by the Institution on behalf of the Company. In undertaking the Project, the Parties shall use their respective reasonable efforts to execute the Project in accordance with prevailing high professional standards and will use reasonable efforts to produce consistently high levels of accuracy and expertise and to meet timetables associated with the applicable Statement of Work. The Parties shall use their respective reasonable efforts to perform the Project in accordance with federal, state and local laws and regulations applicable to the research, as appropriate, including, without limitation, academic standards and all laws and regulations that apply to such standards and applicable ethical standards as well as in accordance with U.S. Food and Drug Administration Good Laboratory Practice regulatory standards. Neither Party provides any warranty as to the commercial or scientific value of any results achieved under this Agreement.

   2.     **Term.** The term of this Agreement shall commence upon the Effective Date of this Agreement and terminate on the 30ᵗʰ day of April, 2021 (the **"Term")** unless sooner terminated in accordance with Section 8 herein or extended by the Parties.

3.      **Payment.** The obligation of the Institution to commence and continue the Project is contingent upon the Company making payments to the Institution in accordance with the budget outlined in Exhibit B ("Budget"). The Parties acknowledge that the Budget amounts represent an equitable exchange for the conduct of the Study in light of the professional time and expenses required for the performance of the Project.  The Budget was prepared by the Project Manager for the completion of the Statement of Work and reviewed and agreed to by the Company.   The Institution agrees to complete the Project on time and according to the agreed upon Budget. Any deviation in timeline and Budget will have to be approved by the Company at its sole discretion.

Payments will be submitted to:

> University of Miami
> Attn: Office of Research Administration. P.O.
> Box 405803
> Atlanta, GA 30384-5803

The Institution's tax identification number is: 59-0624458.

Institution and Company represent that the amount of compensation to Institution hereunder represents the fair market value for the services that Institution has agreed to render and has not been determined in any manner that takes into account the result of the Project or the volume or value of any referrals or business otherwise generated between Institution and/or Project Manager and Company.

4.      **Materials and Resources.**

4.1     All materials, including derivatives and progeny thereof, provided for the Project and all subparts thereof under this Agreement (the "Materials") supplied by either Party, including any Materials included or incorporated into any modifications, shall remain the property of the Party providing it (in any case, the "Provider") and will be used by the receiving Party ("Recipient") solely for the intended Project during the Term (or as permitted under any license granted pursuant to this Agreement). Materials will not be used in human subjects, in clinical trials, or for diagnostic purposes involving human subjects without the prior written consent of the Provider. The Materials will be returned to the Provider or destroyed by the Recipient, as requested by the Provider, at the end of the Term.

4.2     The Materials shall be used with prudence and appropriate caution in any experimental work. ANY MATERIALS PROVIDED SHALL BE PROVIDED WITHOUT WARRANTY OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OR ANY OTHER WARRANTY, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF NON-INFRINGEMENT OF THIRD PARTY RIGHTS. Drugs being utilized in the pre-clinical testing are being purchased by Institution from suppliers. The Parties will use their reasonable best efforts to ensure that the drugs purchased are of adequate quality as necessary for both safety and for accuracy of the testing procedures.

4.3     Except as otherwise expressly provided in this Agreement, no option, license, or conveyance of rights, express or implied, is granted by one Party to the other Party in connection with any Materials provided under this Agreement, except the right to use the Materials strictly for the relevant Statement of Work and in accordance with the terms of this Agreement.

4.4    Institution shall: (a) provide facilities, space and laboratory equipment reasonably necessary for the conduct of the Project at Institution's own costs, except as specifically otherwise provided in this Agreement; (b) provide any animals involved in the Project; (c) provide any drugs or other medical materials involved in the Project; (d) perform the pre-clinical studies; (e) obtain necessary permits and approvals from the FDA and other agencies as may be necessary to handle the drugs involved and to conduct the research; and (f) conduct the Project in accordance with established Institution policies and procedures, as applicable, including, but not limited to, laboratory animals, and hazardous agents and materials, as applicable, which shall comply with all Applicable Laws.

**5.      Independent Contractor.**

5.1     Each of the Parties is an independent contractor and agrees and represents to the other that, except as contemplated by the provisions of this Agreement, neither will attempt at any time to exercise any significant degree of control over the other's research efforts in connection with this Agreement. Exhibit A outlines the agreed scope of the Project.

5.2     Nothing in this Agreement shall be construed to create a partnership or joint venture between the Parties; nor shall Party's employees, servants, agents or representatives be considered the employees, servants, agents or representatives of the other. Neither Party shall have any express or implied right or authority to assume or create any obligation on behalf of, or in the name of, the other, or to bind the other to any contract, agreement or undertaking with any third party.

5.3     Each Party shall be responsible for its own payroll and tax obligations and to provide any and all employment related insurances, including Workers' Compensation and Employer's Liability, for its own employees involved in the Project.

**6      Results. Reports and Records.**

6.1     All "data" from testing undertaken in connection with the Project (the "Results") shall be owned by the Company with the following qualifications: (a) the Company hereby grants to the Institution a perpetual, royalty-free, fully paid-up, non-exclusive, non-sublicensable license solely for research purposes and for its publication in accordance with Section 13 below; (b) all intellectual property rights (which are different than Results) are governed by Section 7 below. For clarity, the above license granted to Institution shall include the right to use Results and data for future grant applications.

6.2     The Institution will provide the Company with quarterly written reports as to the status of the Project and the Results from the prior quarter. The Parties will also additionally hold monthly meetings to discuss any ongoing issues on the Projects, as well as the status of the Project.

6.3     The Institution will further provide a final written report shortly after the completion of each phase of the Statement of Work, or the earlier termination of this Agreement, including all such other information concerning the Statement of Work or the Project overall as the Company may reasonably request.

6.4     The Institution will maintain such records and accounts necessary to assure proper accounting of all funds relating to each phase of the Statement of Work, as applicable. Such records and accounts will be made available to the Company during the Term for the limited purpose of verifying compliance (such records to be kept strictly confidential except to the extent as may be required by law) and for three (3) years after completion of the Project, or earlier termination of this Agreement.

6.5     The Institution shall provide a detailed quarterly accounting to the Company of monies spent during the prior quarter in connection with the Project.

**7.     <u>Intellectual Property Rights.</u>**

7.1      The term "Invention and Discovery" means any invention, discovery, improvement, development, know-how, knowledge, or trade secret conceived and reduced to practice by either party or both parties in the performance of Project under this Agreement, whether or not patented or patentable.

7.2     Inventorship of Inventions and Discoveries will be determined according to applicable U.S. patent laws. Inventions and Discoveries conceived and reduced to practice under this Agreement, and any application for patent or patent granted therefore, shall be the exclusive property of the Company. It is recognized and understood that certain existing inventions and technologies and those arising outside of the Project conducted under this Agreement are the separate property of Company or Institution and are not affected by this Agreement, and neither Party shall have any claims to or rights in such separate inventions and technologies. If Company wishes to pursue prosecution of patent applications thereupon, Company and Institution agree to the following: (a) To cooperate fully and to sign such documents as may be necessary to perfect title and prosecute such patent applications, (b) Title to all such issued patents shall be held by the Company, and the Institution agrees to assign any such patent rights to the Company, (c) Patent expenses incurred in obtaining and maintaining such patents shall be paid by Company, (d) Company shall have full patent prosecution authority of such patents.

7.3     Any new Inventions and Discoveries made during and in the performance of the Project shall be disclosed to Company within sixty (60) days of Institution receipt of an applicable Invention disclosure.

7.4     Institution is granted a royalty-free, irrevocable, non-assignable license to use for its own internal use and for research conducted at the Institution facility pertaining to any Invention and Discovery resulting from the work conceived and reduced to practice under this Agreement.

7.5      Nothing contained in this Agreement shall be deemed to either directly, by implication, by estoppel, or otherwise grant any license under any patents, patent applications, or other proprietary interest to any other inventions, discovery or improvement of either Party.

**8.     <u>Termination.</u>**

8.1     The Project, or any phase within the Statement of Work, may be terminated prior to the completion thereof should any one or more of the following events occur:

    (a)    either Party materially breaches this Agreement, and the non-breaching Party provides the breaching Party with thirty (30) days' advance written notice of termination and such breach is not remedied within such thirty (30) day period;

    (b)    either Party files for creditor protection under any section of the United States Bankruptcy Code;

    (c)    a bankruptcy trustee or receiver is appointed for either Party;

    (d)    any Party determines in its sole judgment that the Project will not achieve a positive outcome;

    (e)    if the Project Manager is unable to continue participating in the Project and Institution is unable to find a mutually agreeable replacement Project Manager.

8.2    A Party must provide ninety (90) days' prior written notice to the other Party of any intent to terminate.

8.3    In the event of termination hereunder the total sums payable by Company pursuant to this Agreement shall be equitably prorated for actual work advanced to the date of termination including, but not limited to, non-cancellable expenses, with any unexpended funds previously paid by Company to Institution being promptly refunded to Company.

8.4    Termination of this Agreement will not affect the rights and obligations of the Parties accrued prior to the termination hereof. The provisions of Section 4, entitled "Materials and Resources Provided, Section 6, entitled "Results, Reports and Records", Section 7, entitled "Intellectual Property Rights", Sections 8.3 and 8.4 within the Section entitled "Termination", Section 9, entitled "Indemnification", Section 11, entitled "Confidentiality", Section **12,** entitled "Publicity", Section 13, entitled "Publication Rights", Section 14, entitled "Additional Work", Section 16, entitled "Governing Law" and Section 23, entitled "Disclaimer of Warranty" shall all survive Termination.

## **9.**    **Indemnification.**

Each of the Parties (each an **"Indemnifying Party")** agrees to indemnify and hold harmless the other Party, its employees, officers and agents (each an **"Indemnified Party"**) from any and all liability, loss, damage and expense (including reasonable attorneys' fees) (collectively, **"Damages"**) caused by or resulting from claims, demands, costs or judgments which may be made or instituted against the Indemnified Party or any of them by reason of (a) the breach of this Agreement by the Indemnifying Party, (b) the negligent acts or omissions of the Indemnifying Party in connection with this Agreement, or (c) use by the Indemnifying Party of any Results and/or any assigned Inventions and Discoveries and intellectual property of any type.

**10.**     **Representations.**

10.1     Institution hereby represents to Company that (i) Institution has full legal right, power and authority to execute, deliver and perform its obligations under this Agreement and (ii) the execution, delivery and performance by Institution of this Agreement do not contravene or constitute a default under any provision of applicable law or its organization documents or under any agreement, judgment, injunction, order, decree or other instrument binding upon Institution.

10.2     Company hereby represents to Institution that (i) Company has full legal right, power and authority to execute, deliver and perform its obligations under this Agreement, (ii) the execution, delivery and performance by Company of this Agreement do not contravene or constitute a default under any provision of applicable law or its organization documents or of any agreement, judgment, injunction, order, decree or other instrument binding upon Company, and (iii) this Agreement constitutes a valid and binding agreement of Company enforceable against Company in accordance with its terms.

**11.**     **Confidentiality.**

11.1     Each of the Parties acknowledges that it may be necessary to disclose information to the other which the disclosing Party considers proprietary or confidential in order for each of the Parties to perform the Project **("Confidential Information").** To preserve the proprietary or confidential nature of such Confidential Information, each Party as a disclosing Party agrees: (a) clearly to mark the term "CONFIDENTIAL" on its Confidential Information upon disclosure to the other Party when such disclosure is made in tangible form or (b) in the case of oral or other intangible disclosures, to indicate the confidential nature of such information in a written summary clearly marked as "CONFIDENTIAL" and transmitted to the other Party within thirty (30) days of the intangible disclosure.  In the event Confidential Information is disclosed and is not orally identified or is not reduced to a writing in accordance with the above, receiving Party agrees to treat such information as Confidential Information of the disclosing Party to the extent a reasonable person in the industry or technical field would regard such information to be confidential given the content and the circumstances of its disclosure.

11.2     During the Term and for a period of five (5) years following the termination or expiration of this Agreement, each Party shall use its reasonable efforts to protect the confidentiality of Confidential information and shall not use it for any purpose other than to exercise its rights and responsibilities under this Agreement and will not sell, transfer, publish or otherwise disclose such information to any third party without the disclosing Party's prior written consent.

11.3     The parties acknowledge and agree that a breach of the provisions of this Section 11 might result in immediate and irreparable harm to the business and goodwill of the other Party and that damages, if any, and remedies at law for such breach might be inadequate and not readily determinable. Upon a breach or threatened breach or violation of the provisions of this Section 11, the disclosing Party shall be entitled to seek from a court of competent jurisdiction equitable relief by way of a temporary or

permanent injunction to restrain any further breach or violation and such relief as the court may deem just and proper at law or in equity.

11.4   The Parties' obligation of non-disclosure shall not apply to any or all of information that:

(a)   is in the public domain at the time of disclosure;

(b)   becomes part of the public domain after disclosure through no fault of the receiving Party;

(c)   is in the receiving Party's possession at the time of disclosure, as demonstrated by written or electronic documentation, or is properly obtained by the receiving Party from a third party with a valid legal right to disclose such information, and such third party is not under a confidentiality obligation to the disclosing Party (excepted from this provision is any confidential information that has been shared between the parties in connection with the development of the Project); or

(d)   is independently developed by the receiving Party without use or reference to the Confidential Information, as demonstrated by written or electronic documentation generated contemporaneously with such independent development.

(e)   is required to be disclosed due to applicable law, court order, statute, or regulation to the extent (i) the receiving Party provides the disclosing Party with written notice of such obligation promptly (prior to the date of legally required disclosure if practicable) of such obligation so that the disclosing Party can seek to limit the extent and conditions of such required disclosure; and provided that (ii) the receiving Party only discloses that portion of the Confidential Information it is legally compelled to disclose.

**12.    Publicity.** Neither Party shall, without the prior written consent of the other Party, use the name of the other Party, nor of any member of the other Party's staff, any employee or student of the other Party, nor any of the other Party's trademarks, nor any adaptation of any of the foregoing, in connection with any products, promotion, articles, press release or other commercial communication or advertising without the prior written approval of the other Party. Notwithstanding the foregoing, Institution consents to Company's disclosure of this Agreement and the use of the name of Institution as part of regulatory submissions and as may be otherwise required by applicable laws and in connection with Company's financing activities, including in any investor presentations. Institution may acknowledge, without Company's prior approval, Institution's receipt of financial support from Company and participation in connection with the general subject matter of this Agreement and may acknowledge Company contribution in any publication of data and results generated under the Project. The Parties understand and agree that publications are addressed in Section 13 of this Agreement.

**13.    Publication Rights.**

13.1   Subject to the provisions of this Section 13, Institution shall have the right to publish its results of and disseminate information it obtained pertaining to its work on the Project conducted under this Agreement whether in symposia, national or

regional professional meetings or in journals, theses or dissertations, subject to Section 13.2 below.

13.2    Institution agrees to submit any proposed publication or public presentation of the results of any phase within the Statement of Work under the Project to the Company for review at least sixty (60) days prior to the date of submission for publication or the scheduled date for public presentation, which ever date may be earlier. The purposes for such prior submission are: (i) to identify any Company Confidential Information to be deleted from the proposed publication or presentation; and (ii) to allow time for any patentable subject matter to be identified. Company shall provide any comments to Institution within thirty (30) days of receipt of the proposed publication or presentation. Institution shall give due consideration to any comments made by Company however, Institution shall have no obligation to incorporate Company's comments into the publication. Institution hereby agrees to delete from the proposed publication any Company Confidential Information, which Company requests Institution to delete (excluding any Results of the Project or individual phases of the Project). Company personnel shall be acknowledged with customary scientific practice. Company shall have thirty (30) days after receipt of the proposed publication or presentation to object to the proposed publication or presentation on the grounds that there is patentable subject matter that needs protection. In the event Company makes such objection, the Institution shall refrain from making such publication or presentation for such time as requested by Company, but in any event no longer than sixty (60) days from the date of receipt of such objection, in order for patent application(s) directed to the patentable subject matter contained in the proposed publication or presentation to be filed with the United States Patent and Trademark Office and/or foreign patent office(s).

**14.    Notice.** Any notice or communication pursuant to this Agreement shall be sufficiently made or given if sent by certified or registered mail, postage prepaid, or by overnight courier, with proof of delivery by receipt, addressed to the address below or as either Party shall designate by written notice to the other Party.

In the case of Institution, to:

University of Miami
Attn: Executive Director, Pre Award
Office of Research Administration
1320 South Dixie Highway, Suite 650 Coral
Gables, FL 33146
Telephone Number: (305) 284-3952
Email: cris@med.miami.edu

In the case of Company, by email to:

Jonathan Gilbert
j.gilbert@tassililifesciences.com

With an additional copy to

Maghsoud Dariani        mdariani@comcast.net

**15.**    **Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of Florida notwithstanding any conflicts of laws principles to the contrary, and any suit to enforce the terms of this Agreement or otherwise arising under this Agreement, shall be brought in the federal or state courts located within Miami-Dade County, State of Florida, USA.

**16.**    **Entire Agreement.** This Agreement, together with all attachments and exhibits, constitutes the entire agreement and understanding between the Parties and supersedes any prior or contemporaneous negotiations, agreements, understandings, or arrangements of any nature or kind with respect to the subject matter herein and may only be amended by written agreement by and between the Parties. In the event of any inconsistency between this Agreement or any attachments and exhibits, the terms of this Agreement shall govern.

**17.**    **Waiver.** Neither Party waives its right to enforce any and all provisions of the Agreement at any time during the Term. Either Party's failure to enforce any provision shall not prejudice such Party from later enforcing or exercising the same or any other provision of the Agreement.

**18.**    **Modifications.** This Agreement may not be changed, altered, modified, amended, rescinded, canceled or waived except by a writing executed by authorized representatives the Parties.

**19.**    **Binding Agreement on Successors.** This Agreement may not be assigned by either Party without the prior written consent of the other Party.

**20.**    **Headings.** Headings are for convenience of reference only, and not for interpreting the provisions of the Agreement.

**21.**    **Counterparts.** Execution signatures to this Agreement may be exchanged as scanned e-mail attachments and all signatures so exchanged shall be considered as original for all purpose. This Agreement may be executed in counterparts, and by either Party on a separate counterpart, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**22.**    **Disclaimer of Warranty.**    THE PARTIES EXPRESSLY DISCLAIM ALL WARRANTIES RELATED TO THE PROJECT RESULTS AND DATA, INCLUDING IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR USE. Notwithstanding the foregoing, such disclaimer of representations and warranties shall apply to the Project results and data and not to the Parties' obligation to comply with the terms of this Agreement, to conduct the Project in accordance with the Statement of Work and this Agreement and to obtain data according to acceptable professional or applicable regulatory standards.

        IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective duly authorized representatives as of the date first above written.

Tassili Life Sciences Corp.                   University Of Miami

                                              Digitally signed by D. Stewart
                                              MacIntyre III
                                              Date: 2020.02.04 14:09:03
                                              -05'00'

By: Jonathan Gilbert                          By: D. Stewart MacIntyre III, JD

Title: CEO

Date: **02/04/20**

Title: Director, Office of Research Administration

Date: 2/4/20

Read and Understood

By: Michael Hoffer, MD

Title: Project Manager

Date: 2/4/20 .

**Exhibit A**
**Statement of Work**

Background
Advances in neurodiagnostic assessment have revealed mild traumatic brain injury (concussion) is more common than previously thought and potentially associated with host of negative health outcomes. In fact, the Centers for Disease Control (CDC) estimates that there are 3 Million ER Visits and over 230,000 hospitalizations due to TBI in any given year in the United States alone. At the same time there are 5.3 Million Americans living with the effects of mTBI (a 53% increase over ten years ago). [1] The World Health Organization (WHO) calls traumatic brain injury a "silent epidemic" that affects over 70 Million individuals across the world. [2] The Department of Defense estimates that over 345,000 individuals are affected by mTBI and that 20% of all service members who deploy suffer mTBI. [3]

Post-traumatic stress disorder (PTSD), formerly known by the terms "shell shock" and "combat fatigue", is well documented among combat veterans. Individuals with PTSD experience intense and disturbing uncontrollable thoughts following exposure to trauma, as well as strong emotional reactivity that may include intense fear or anger, severe anxiety and depression, detachment, and strong negative reactions to loud noises. The National Institute of Health estimates that there are 8 Million new cases a year and that 6.8% of the U.S. population will suffer PTSD at some point in their lifetime. [4,5] This number is mirrored worldwide with WHO reporting a rate of 2.1%-7.8% of the world's population affected by the disorder. [6]

***mTBI and PTSD are significant health care issues that often co-occur and impact each other***. For example, PTSD may complicate mTBI recovery and mTBI can impede emotional resilience associated with psychological trauma. Longitudinal studies examining the combined impact of PTSD and mTBI

indicate enduring psychological and cognitive effects that remain intertwined well post exposure to trauma. These include poor physical health, reduced quality of life, and negative psychological well-being. [7]  Depending on the circumstances, over 50% of mTBI cases have concurrent PTSD and that figure continues to grow over time. [8,9]  The combination of these disorders, therefore, affects millions of individuals.  Moreover, the physical and cognitive effects of the combined disorders are dramatically greater than for either disorder alone.  That is to say that the mTBI sequela are greater when there is coincident PTSD  than when there is mTBI alone and the PTSD sequala are more impactful when the PTSD is secondary to mTBI.  Attempting to treat mTBI and/or PTSD alone is very challenging. To date, *there are no effective pharmaceutical treatments* for the combination of these disorders.  In this proposal we examine a strategy that combines two products for the treatment of PTSD and mTBI in a pre-clinical model. The proposal will use a well-established small rodent model (rat model) to test the use of a combination of products Cannabidiol (CBD) and Psilocybin(PS) in animals that have been subjected to mild-moderate traumatic brain injury with PTSD induced through a established rodent PTSD paradigm.

Specific Aims
This project is designed to examine a novel combination of products administered orally in a pre-clinical model of PTSD alone and combined mTBI and PTSD.  The use of these compounds orally will establish the ability of these medications to be effective when absorbed through the gut and subject to first pass clearance by the liver.   Moreover, the compounds must pass across the blood brain barrier and as such the compounds must be dosed in such a way that significant medicine reaches the targets inside the brain. The chemistry of oral bioavailability, first pass clearance, and permeability across the blood brain barrier is critically important but only if the medicines produce an affect.  As such the specific aims of this project are to establish that the medicines can be given safely and produce an affect. Once this is established more specific work can examine dose response, medicine uptake, and medicine levels in specific brain tissue.

   The specific aims of the project are as follows:
   1)  Demonstrate that oral Psilocybin (PS) alone and in combination with oral Cannabidiol (CBD) is tolerable and safe in the animal model.
       This must be performed in a variety of animal conditions as follows
       a)  Rats that have undergone no trauma
       b)  Rats that have undergone trauma (to be determined when SA 2 addressed)

   2)  Demonstrate the PS in combination with CBD has beneficial effects in animals undergoing head trauma combined with a stress that produces PTSD in  terms of objective measures of
       a.  Cognitive function
       b.  Hearing
       c.  PTSD response
   The standard measures shown are a critical means of determining the effectiveness of the combination of the two products on the effects of mTBI and PTSD and will be detailed below.

Significance
The combination of mTBI (Concussion) and concurrent PTSD is a major world health crisis that affects millions of people every year. This field is complicated by the fact that there are few, if any, accepted pharmacologic countermeasures for either disorder. For mTBI/concussion randomized trials have examined a variety of different therapies to include pharmacologic, rehabilitation, and hyperbaric medicine and have shown no proven benefit. [10]  In the field, a variety of treatment options have been tried with little consistent benefit. [11]  Most practitioners do not have a well-established treatment regimen and in most cases offer only symptomatic relief of headaches using non-steroidal anti-

inflammatories. [12]  There are more accepted pharmacologic treatment modalities for PTSD but despite over fifty randomized controlled trials, only the Serotonin Re-uptake inhibitors (SSRI's) have shown any benefit and much like non-steroidal medicines for headache, these medicines simply treat the anxiety component of the disorder rather than the disorder. [13]  There remains no accepted pharmacologic treatment for either disorder that addresses the primary neuropathology. Moreover, even if a pharmacologic treatment for one of the two conditions is developed, it is unlikely that any single therapy will address the primary pathology of both conditions at the same time.

Rationale for using CBD
The chemical effect of CBD is hypothesized to reduce inflammation and to inhibit gliosis via inhibition of the immune cascade.   One way to obtain this effect is through the use of a CB-2 agonist. The current



study proposes to use cannabidiol (CBD), a naturally occurring chemical in certain varieties of marijuana, as the second component for the study.   CBD has no psychoactive effect.  CBD acts as a CB-2 agonist and presents a broad range of anti-inflammatory and immune inhibitory effects. There is extensive research into the cannabinoid CB2 receptor as a target for inflammation-dependent neurodegeneration. [14] There is a long history of the study of CBD as an anti-inflammatory agent and it has been tested in phase III clinical trials as a treatment for various disorders.  Although research on the use of CBD and other cannabinoids as a possible treatment for various inflammatory disorders has been ongoing for decades, interest in this area has increased dramatically over the last 15 years.  Aside from the general articles on cannabinoids and inflammation, there are many articles that specifically address cannabinoids as a possible treatment for concussions. [15-17]  Recently work in our lab has demonstrated some positive effects of CBD (delivered interperitoneally) in a rat model of mTBI.  Using a fluid percussion model, rats given CBD following a head injury took less time to locate a hidden platform in the water maze task compared to animals that undergo head injury and receive vehicle alone after TBI (Figure 1).

Figure 1. Bar graph of the hidden platform task.  Animal treated with CBD after fluid percussion brain injury located the hidden platform in less time compared to vehicle treated animals.

In this same exposure pattern CBD treated animals demonstrated a reduced contusion volume when compared to vehicle treated animals



Figure 2. Bar graph of contusion volume.  Animals treated with CBD had a reduced contusion volume on day 21 after brain trauma compared to vehicle treated animals.

In a second model rats receiving CBD after blast injury have significantly better hearing outcomes than those that receive vehicle alone after the blast exposure
Figure 3



Figure 3  Bar graphs showing significantly improved hearing performance for animals after undergoing controlled blast exposure treated with CBD as compared to animals undergoing controlled blast treated with vehicle.  Differences are significant for days 3, 7, and 14 after the blast

The evidence suggests that CBD may work as a primary countermeasure for brain injury

Rationale for use of Psilocybin

While pharmacologic advances over past six decades have produced significant benefits for many debilitated by psychiatric disorders such as PTSD , there remains significant numbers of individuals who have not experienced relief. Antipsychotics, antidepressants, anxiolytics and off label use of drugs to stabilize mood take a long time to show efficacy or lack of response and are frequently accompanied by a range of unwanted side effects over the long term.  Psychological interventions, such as supportive psychotherapy, cognitive behavioral therapy, EMDR and biofeedback may work for some but the drop out rate is high due to the emotional challenge associated with PTSD that includes intense anxiety and hopelessness.  Psilocybin offers potential as a promising new treatment for PTSD. Unlike the hallucinogenic MDMA, in which there are known neurotoxic effects, psilocybin has the capacity for psychosocial healing that is not accompanied by adverse physiological or psychological reactions. Rather, literature is emerging, beginning in the l960s, that this psychedelic intervention, when administered in the appropriate setting by experienced clinicians to carefully screened individuals, can activate one's inner capacity for healing  by inducing a psychological experience,  described by terms that include "spiritual" and "mystical", that leads to a replenished sense of purpose and self and new meaning in life.  [18] Below are Phase 2 clinical trials, as outlined in Mithoefer, Grob, Brewerton (18) using psilocybin in the context of assisted psychotherapy.

| | Location | Status | Sample size | Timing |
|---|---|---|---|---|
| Obsessive-compulsive disorder[10] | University of Arizona (Tucson, AZ, USA) | Complete | 9 | Results published in 2006 |
| Cancer anxiety[11] | Harbor–UCLA Medical Center (Torrance, CA, USA) | Complete | 12 | Results published in 2011 |
| Cancer anxiety (ClinicalTrials. gov, number NCT00465595) | Johns Hopkins University (Baltimore, MD, USA) | Complete | 51 | Results submitted for publication |
| Cancer anxiety (ClinicalTrials. gov, number NCT00957359) | New York University (New York, NY, USA) | Complete | 31 | Results submitted for publication |
| Alcohol dependence[12] | University of New Mexico (Albuquerque, NM, USA) | Complete | 10 | Results published in 2015 |
| Alcohol dependence (ClinicalTrials.gov, number NCT02061293) | New York University (New York, NY, USA) | Ongoing | 180 | Expected completion 2016 |
| Tobacco cigarette addiction[13] | Johns Hopkins University (Baltimore, MD, USA) | Complete | 15 | Results published in 2014 |
| Cocaine use (ClinicalTrials. gov, number NCT02037126) | University of Alabama (Tuscaloosa, AL, USA) | Ongoing | 40 | Estimated completion May, 2017 |

Psilocybin=4-phosphorloxy-N,N-dimethyltryptamine.

*Table 1*: **Phase 2 studies of psilocybin-assisted psychotherapy**

Rationale for use of the rat model

Small animal models are essential in the study of mTBI and PTSD. [18-2]  These animal models allow investigators to study the functional impact of both insults and to examine the anatomic pathologic

correlates. Moreover, these animals allow investigators to include enough animals to overcome the natural heterogeneity of both disorders (mTBI and PTSD). The most common small rodents used in this work are mice and rats. [19 -21] Mice are typically used when genetic studies are an important part of the work whereas rats are a better model when behavior will be studied since rats are more amenable to the training necessary to display the characteristics responses of PTSD (which involves changes in behavior of a previous trained and reliable model behavior). In this experiment we will utilize the rat for the following reasons: 1) Behavioral outcomes on tests of PTSD and mTBI are a core portion of this work, 2) Rats are hardier and a better model for the dual insult of mTBI and PTSD, 3) Our labs have extensive experience with the rat model, behavioral testing, and a variety of outcome measures.

Materials and Methods
Experimental Design
In order to address AIM 1 (safety) we will begin by preparing a preparation of both CBD and Psilocybin that will be used to gavage the animals. Three preparations will be prepared. The base (vehicle) for dissolving the compounds will be peanut oil (since both CBD and PS are lipid soluble). The preparations will be: 1) CBD (2.0 mg) and PS (0.2 mg), 2) CBD (5.0 mg) and PS (0.5 mg) and 3) Peanut Oil alone. In the initial safety experiments animals will undergo once daily oral gavage dosing for seven days. The animals will survive for thirty days. Safety and tolerance will be determined by assessing for any clinical signs that would indicate poor health daily during drug administration followed by weekly assessment until euthanasia (See Appendix 1). For safety analysis we hope to have 10 animals per group and therefore this part of the experiment will require 30 animals.

 For Aim 2, we will examine five main exposure groups as follows: 1) No exposure, 2) Sham fluid percussion (surgical prep but no fluid percussion injury) plus PTSD trigger, 3) FP plus PTSD trigger, 4) Blast plus PTSD trigger, 5) Repeated Blast (known to be a PTSD trigger)alone. Each exposure is detailed below. In each of the 5 groups there will be two dosing paradigms as follows A) Vehicle alone and B) CBD plus PS. Since our previous work demonstrates the need for 12-15 rats per group. Each of the five exposure models will require 24-30 rats for a total of 120-150 rats. Given this volume of animals we will initially focus on three groups as follows: Group 1) No exposure, Group 3) FP plus PTSD trigger, Group 4) Blast plus PTSD trigger, and Group 5 (repeated blast) thus requiring a total of 96-120 animals. Comparisons will be made between the performance of the rats within each group on each test using stated statistical methods to assess group mean differences (ANOVA, etc.)

**Methodology in detail**
Gavage  - The combination of CBD and PS powder will be solubilized in a small amount of peanut oil. The peanut oil solution will then be orally gavaged into the animals once daily for seven days beginning within one hour of exposure and continuing for six more daily doses.

Production of mTBI – Our labs have significant experience with mTBI models and two models will be utilized for this experiment a fluid percussion model (mild – moderate mTBI) and a blast model (mild mTBI)

Fluid Percussion model
Day 1 : For surgical preparation for the injury cap, isoflurane anesthesia is maintained via nose cone and the injury cap is placed on the exposed dura as follows. The rat's head is shaved and swabbed with clorohexadine solution. The rat is then placed in a stereotaxic frame and the scalp surgically incised. A parasagittal craniotomy (4.8 mm) using a trephine is performed at 3.8 mm posterior to bregma and 2.5 mm lateral to the midline. A sterile plastic injury tube (the plastic connector of a sterile needle cut 1 cm in length and trimmed to fill the craniotomy perfectly) is next placed over the exposed dura and bonded by crynoacrylic adhesive to the skull. Dental acrylic is then poured around the injury tube to obtain a

perfect seal. After the acrylic has hardened, the scalp is stapled/sutured back. Animals are removed from the anesthesia and returned to their home cage.

 Day 2: 24 hours after the previous injury cap preparation, the rats are reanesthetized with 0.5-5% isoflurane via a custom built anesthesia chamber, the animal is placed on the table and anesthesia is administered via a nose cone until catheters are placed and the animals is intubated. A catheter is placed in the right femoral artery or tail artery to monitor arterial blood pressure and blood gases. Brain temperature is indirectly measured by a thermistor placed in the left temporalis muscle and maintained at a normothermic (37oC) level prior and subsequent to TBI. Rectal temperature is also maintained at normothermic levels. After intubation, the animal is connected to a respirator  and ventilated with 0.5-5% isoflurane in a mixture of 70% nitrous oxide and 30% oxygen. We use 14G IV catheters for the ventilation tube which we have modified to an appropriate length. The ventilation rate is 48 to 58 strokes per minute and the tidal volume is 2.5-3.5, this is adjusted for the weight of the animal. The animal is paralyzed with rocuronium or pancuronium or vencuronium for mechanical ventilation to maintain arterial blood gases within normal limits.   The fluid percussion device consists of a plexiglass cylindrical reservoir bounded at one end by a rubber-covered plexiglass piston with the opposite end fitted with a transducer housing and a central injury screw adapted for the rat's skull. The entire system is filled with isotonic saline. The (aseptic) metal injury screw is next firmly connected to the plastic injury tube of the intubated and anesthetized rat. The injury is induced by the descent of a metal pendulum striking the piston, thereby injecting a small volume of saline epidurally into the closed cranial cavity and producing a brief displacement (18 msec) of neural tissue. The amplitude of the resulting pressure pulse is measured in atmospheres by a pressure transducer and recorded on a PowerLab chart recording system. Sham animals will undergo all surgical procedures but are not subjected to the fluid percussion pulse. In the proposed studies, a moderate (1.8-2.2 atm) injury will be studied. Animals will receive Buprenorphine after the TBI. After either the TBI or sham injury, the injury cap is removed and the scalp is closed using staples. The area around the femoral artery will be prepped for sterility. The sterile  incision for femoral artery cannulations is stapled as well. For tail artery incisions, the tail is sutured together with sterile sutures. After 45 min-1.5 hours, the animal awakens and is moved to an individual cage supplied with food and water until termination of the study. If the animal has difficulty eating, then the animal will be humanely euthanized. Similar to the previous brain injury protocols in the Bramlett lab, the rats (pre- and post-injury) in this protocol will be fed per the manufacturers recommended daily amount of 6 pellets per day for rats. Staples or sutures are removed 10-14 days post-injury after briefly placed under isoflurane anesthesia.

Blast injury

All animals will be anesthetized and placed in an animal holding tube inserted and secured one-foot within the end of the condensing tube. The animal holding tube positions the animal with the rat's dorsal head surface to the on-coming shock wave. Subjects will be positioned 10 feet from the tube film diaphragm and will receive a BOP wave in a head-on orientation. The holding tube allows for isoflurane gas to feed to the animal to induce anesthesia allowing exposures to live but anesthetized animals. BOP waves will be measured and displayed for peak intensities, rise time and BOP wave durations using a Pacific Instruments 6000 DAQ with up to 32 channels, each with 250 kHz recording speed along with Dytran pressure transducers rated for 0 50 PSI measurement range and electronic conditioners interfaced with computers. An exposure will consist of anesthetized animals receiving a single blast wave exposure. Our initial investigations will examine the effects of single 10-20 psi (Friedlander wave with overpressure-underpressure sequence) which have been shown to demonstrate pathological effects

Production of PTSD
Predatory Threat

Rats will be moved to special plastic cages which contains male cat urine for 10 minutes.  This exposure creates a lasting PTSD phenotype in a humane fashion. [22]  This cat urine exposure will take place prior to any TBI insult.

Repeated Blast Model
A body of work has shown that repeated exposure of anesthetized rats to low level blast will produce a
PTSD Phenotype. [23]  In order to produce this effect rats will be exposed to blast as was described
earlier. This blast will be repeated for three consecutive days.  This PTSD model will initially be
performed on one separate group of animals.  This exposure produces both a mTBI and PTSD
pheonotype and therefore does not have to be combined with any other exposure.

Outcome measures
A variety of outcome measures will be performed on all of the animals in this experiment.  All outcome
measures have been shown to be sensitive to changes that occur after mTBI, PTSD, and both disorders.

1. Auditory Startle Response
In this outcome measure we will use a special Plexiglas soundproof tube attached to an accelerometer and
a special auditory speaker system. (SR labs, San Diego CA USA).[24] The device will be calibrated at
regular intervals to measure sound levels.  Rats with no pre-training will be placed in the tube and given
5 minutes to acclimatize with 68 dB background white noise.  After five minutes the rats will be exposed
to a 50ms of 110dB tone delivered every 30 seconds for 15 minutes.  Peak whole body startle response
will be measure every 1 ms for 100 ms after the startle exposure in an automated fashion.  The average
peak value per rat is normalized by body weight to obtain a value.

2. Light-Dark Emergence tasks
A light dark emergence task is performed by placing rats in a specially designed box/chamber that has a
dark and lighted side separated by a tunnel.  Rats naturally seek the lighted side.[25]   In this experiment
we will place rats in the specially designed box for 5 minutes.  The rats will be placed initially in the dark
side and we will measure three outcomes 1) Amount of time in seconds required to reach lighted side, 2)
Number of the rat entries into the lighted side, 3) Total amount of time spent in the lighted side.  There
are no special preparations required to perform this test and no training is required as well.

2. Sensorimotor Testing:
Spontaneous Forelimb Use:  This test, described by Schallert and Lindner (1990) [26], assesses forelimb
use during voluntary, spontaneous activity by evaluating the propensity of animals to adduct their
forelimbs while rearing or standing.  Animals are videotaped in a clear plastic cylinder for 5 minutes.  The
videotapes are scored in terms of forelimb-use asymmetry during vertical movements along the wall of
the cylinder and for landings after a rear: (a) independent use of the left or right forelimb for contacting
the wall of the cylinder during a full rear, to initiate a weight-shifting movement or to regain center of
gravity while moving laterally in a vertical posture along the wall; Wall lands/movements and floor lands
are each expressed in terms of (a) percent use of the ipsilateral (non-impaired) forelimb relative to the
total number of ipsilateral and contralateral placements.  During a rear, the first limb to contact the wall
with clear weight support (without the other limb contacting the wall within 0.5 sec) is scored as an
independent wall placement for that limb.  Limb use ratio is calculated as contralateral/(ipsilateral +
contralateral). This is assessed prior to brain injury as well as approximately 1 week post-trauma.

2. Cognitive Testing:
The analysis of cognitive function involves an assessment of spatial navigation using the water maze.
Experiments that are primarily directed at assessing the activity of animals at numerous time points
following TBI (such as when assessing the efficacy of therapeutic treatments designed to lessen the
consequences of TBI) rely primarily on "acquisition" paradigms involving the simple place task and

working memory task, in which the animals are required to learn a new platform location during each test session.  This protocol does not involve pretraining or testing in the water maze prior to surgery.

General Procedures:  The water maze used in this laboratory is a round pool (122 cm diameter; 60 cm deep) filled with water at 25 degree C.  The maze is located in a quiet, windowless room, with a variety of distinct, extramaze cues.  Four points on the rim designated as north (N), east (E), south (S), and west (W), serve as starting positions and divide the maze into four quadrants.  A round platform is placed 1.5 cm beneath the surface of the water, at a location that varies according to the requirements of the task (see below).  The animal's movement is videotaped with a CCD video which records the swim path.  This animal's swim path is then analyzed with Ethovision (Noldus) software program.  This program determines path length, latency to reach the platform, time spent in each quadrant of the water maze, and swim speed.

2a. Hidden Platform Task:  The platform is located in a target quadrant of the maze.  Each animal receives four trials each day that may last up to 60 s.  If the rat successfully locates the platform within the 60 sec, it is allowed to remain for 10 seconds. Otherwise, once 60 s elapses, it is placed on the platform for a period of 10 seconds.  Inter-trial intervals are two to four minutes, during which rats are placed under a heat lamp.

2b. Probe Trial:  This consists of removing the platform completely from the pool. Animal is released from a predetermined position and the swim pattern is recorded for 30 seconds.  An animal with intact spatial memory should spend a majority of time swimming in the target quadrant that previously contained the hidden platform.

2c. Working Memory Task: For the working memory task, the animal is given 60 seconds to find a submerged (non-cued) platform placed in a novel location within the pool. If the rat fails to find the platform within 60 seconds, the animal is placed on the platform for 10 seconds. This is considered Trial 1. Five seconds following Trial 1, a second identical trial is conducted for that same rat. Rats are placed under a heat lamp for 4 minutes between each paired trial. After running the group of rats as above, the platform is then moved to another novel  location within the pool, and  the paired trials are repeated. Five paired trials occur each day for 2 days.

3. Auditory Brainstem Response (ABR):
Hearing thresholds will be determined by auditory brainstem response (ABR) via subcutaneous platinum needle electrodes placed at the vertex (reference), right mastoid (negative) and the left hind limb with the animals anesthetized with ketamine (150 mg/kg) and xylazine (10 mg/kg). Digitally-generated stimuli will consist of 1024 specific frequency tone bursts at  between 3 and 30 kHz with a trapezoid envelop of 5 ms overall duration. The trapezoid will be presented at a 3 ms plateau with 1ms rise and fall. The stimulus will be routed through a computer-controlled attenuator to an insert earphone (Etymotic Research ER-2). The sound delivery tube of the insert earphone will be positioned about 5 mm from the tympanic membrane.   The output of the insert earphone will be calibrated by measuring the sound pressure level at a position 4-5 mm away from the tympanic membrane.  The electrical response from the recording electrode will be amplified (100,000 x), filtered (100-3000 Hz) and fed to an A/D converter on a signal processing board in the computer.  Eight hundred to twelve hundred samples will be averaged at each level.  Stimuli will be presented at the rate of 16/sec and the stimulus level will be varied in 10 dB descending steps, until threshold is reached, then a 5 dB ascending step to confirm.  Threshold is defined as the mid-point between the lowest level at which a clear response is seen and the next lower level where no response is seen.  ABR is determined as a reproducible wave II response.

Statistics

All outcome measures yield measurable responses.  The group mean response to each outcome will be compared utilizing an analysis of variance with significant differences set at p less than or equal to 0.05. Comparisons will be made between groups (types of treatment) in each exposure condition (e.g. CBD/PS vs. control carrier after Fluid Percussion plus PTSD stress).

**Appendix 1**
**Animal Number:** _____

| Clinical Signs | Date | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Body Weight | | | | | | | | | |
| self-mutilation such as autotomy, excessive grooming leading to loss of dermal layers | | | | | | | | | |
| spontaneous vocalization when stimulated or touched | | | | | | | | | |
| any loss of >15% of body weight, inability to feed or drink | | | | | | | | | |
| poor grooming habits; listlessness; head in the corner of the cage | | | | | | | | | |
| excessive activity | | | | | | | | | |
| animals which develop a non-resolving infection at the surgical incision | | | | | | | | | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Dysphoria | | | | | | | | | |
| Apathy | | | | | | | | | |
| Kyphosis | | | | | | | | | |
| Piloerection | | | | | | | | | |
| Dehydration | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

Bibliography

1. https://www.cdc.gov/traumaticbraininjury/index.html

2. Dewan MC, Rattani A, Gupta S, Baticulon RE, Hung YC, Punchak M, Agrawal A. Adeleye AO, Shrime MG, Rubiano AM, Rosenfeld JV, Park KB. Estimating the global incidence of traumatic brain injury. J Neurosurg. 2018 Apr 1:1-18. doi:10.3171/2017.10.JNS17352. PubMed PMID: 29701556.

3. https://dod.defense.gov/News/Special-Reports/0315_tbi/

4. https://www.nimh.nih.gov/health/topics/post-traumatic-stress-disorder-ptsd/index.shtml

5. https://www.nimh.nih.gov/health/topics/post-traumatic-stress-disorder-ptsd/index.shtml

6. https://www.who.int/mediacentre/news/releases/2013/trauma_mental_health_20130806/en/

7. Vasterling JJ, Jacob SN, Rasmusson A. Traumatic Brain Injury and Posttraumatic Stress Disorder: Conceptual, Diagnostic, and Therapeutic Considerations in the Context of Co-Occurrence. J Neuropsychiatry Clin Neurosci. 2018 Spring;30(2):91-100. doi: 10.1176/appi.neuropsych.17090180. Epub 2017 Nov 14. Review. PubMed PMID: 29132272.

8. Stein MB, Jain S, Giacino JT, Levin H, et al Risk of Posttraumatic Stress Disorder and Major Depression in Civilian Patients After Mild Traumatic Brain Injury: A TRACK-TBI Study. JAMA Psychiatry. 2019 Mar 1;76(3):249-258. 10.1001/jamapsychiatry.2018.4288. PubMed PMID: 30698636; PubMed Central PMCID:PMC6439818.

9. https://www.psychiatrictimes.com/traumatic-brain-injury-and-posttraumatic-stress-disorder

10. Brolinson PG. Management of sport-related concussion: a review. Clin J Sport Med. 2014 Jan;24(1):89-90. doi: 10.1097/JSM.0000000000000062. PubMed PMID: 24366016.

11. Mannix R, Zemek R, Yeates KO, Arbogast K, Atabaki S, Badawy M, Beauchamp MH,Beer D, Bin S, Burstein B, Craig W, Corwin D, Doan Q, Ellis M, Freedman SB, Gagnon I, Gravel J, Leddy J, Lumba-Brown A, Master C, Mayer AR, Park G, Penque M, Rhine T, Russell K, Schneider K, Bell M, Wisniewski S. Practice Patterns in Pharmacological and Non-Pharmacological Therapies for Children with Mild Traumatic Brain Injury: A Survey of 15 Canadian and United States Centers. J Neurotrauma. 2019 Oct 15;36(20):2886-2894. doi: 10.1089/neu.2018.6290. Epub 2019 Jun 17. PubMed PMID: 31025612.

12.   Makdissi M, Schneider KJ, Feddermann-Demont N, Guskiewicz KM, Hinds S, LeddyJJ, McCrea M, Turner M, Johnston KM. Approach to investigation and treatment of persistent symptoms following sport-related concussion: a systematic review. Br JSports Med. 2017 Jun;51(12):958-968. doi: 10.1136/bjsports-2016-097470. Epub 2017May 8. Review. PubMed PMID: 28483928.

13.   Hoskins M, Pearce J, Bethell A, Dankova L, Barbui C, Tol WA, van Ommeren M, de Jong J, Seedat S, Chen H, Bisson JI. Pharmacotherapy for post-traumatic stress disorder: systematic review and meta-analysis. Br J Psychiatry. 2015 Feb;206(2):93-100. doi: 10.1192/bjp.bp.114.148551. Review. PubMed PMID: 25644881.

14.   Ashton JC, Glass M. The Cannabinoid CB2 Receptor as a Target for Inflammation-Dependent Neurodegeneration. Current Neuropharmacology. 2007;5(2):73-80.

15.   Fernández-Ruiz J, Romero J, Ramos JA. Endocannabinoids and Neurodegenerative Disorders: Parkinson's Disease, Huntington's Chorea, Alzheimer's Disease, and Others. Handb Exp Pharmacol. 2015;231:233-59.

16.   Pryce G, Baker D. Endocannabinoids in Multiple Sclerosis and Amyotrophic Lateral Sclerosis. Handb Exp Pharmacol. 2015;231:213-31.

17.   Iannotti FA, Di Marzo V, Petrosino S. Endocannabinoids and Endocannabinoid-Related Mediators: Targets, Metabolism and Role In Neurological Disorders. Prog Lipid Res. 2016 Mar 7. pii: S0163-7827(15)30023-0. doi:10.1016/j.plipres.2016.02.002.

18.   Mithoefer MC, Grob CS, Brewerton TD. Novel psychopharmacological therapies for psychiatric disorders: psilocybin and MDMA. Lancet Psychiatry. 2016 May;3(5):481-8. doi: 10.1016/S2215-0366(15)00576-3. Epub 2016 Apr 5. Review. PubMed PMID: 27067625.

19.   Schöner J, Heinz A, Endres M, Gertz K, Kronenberg G. Post-traumatic stress disorder and beyond: an overview of rodent stress models. J Cell Mol Med. 2017Oct;21(10):2248-2256. doi: 10.1111/jcmm.13161. Epub 2017 Apr 4. Review. PubMed PMID: 28374949; PubMed Central PMCID: PMC5618668.

20.   Prater KE, Aurbach EL, Larcinese HK, Smith TN, Turner CA, Blandino P Jr, Watson SJ, Maren S, Akil H. Selectively Bred Rats Provide a Unique Model ofVulnerability to PTSD-Like Behavior and Respond Differentially to FGF2 Augmentation Early in Life. Neuropsychopharmacology. 2017 Jul;42(8):1706-1714.doi: 10.1038/npp.2017.37. Epub 2017 Feb 16. PubMed PMID: 28205604; PubMed Central PMCID: PMC5518903.

21.   Perez-Garcia G, Gama Sosa MA, De Gasperi R, Tschiffely AE, McCarron RM, Hof PR, Gandy S, Ahlers ST, Elder GA. Blast-induced "PTSD": Evidence from an animal model. Neuropharmacology. 2019 Feb;145(Pt B):220-229. doi: 10.1016/j.neuropharm.2018.09.023. Epub 2018 Sep 15. Review. PubMed PMID: 30227150.

22.   Milad MR, Quirk GJ. Fear extinction as a model for translational neuroscience: Ten years of progress. Annu Rev Psychol. 2012;63:129-51. doi:10.1146/annurev.psych.121208.131631. Review. PubMed PMID: 22129456; PubMed Central PMCID: PMC4942586.

23.   Goswami S, Samuel S, Sierra OR, Cascardi M, Paré D. A rat model of post-traumatic stress disorder reproduces the hippocampal deficits seen in the human syndrome. Front Behav Neurosci. 2012 Jun 12;6:26. doi:10.3389/fnbeh.2012.00026. eCollection 2012. PubMed PMID: 22701407; PubMed CentralPMCID: PMC3372979.

24.   Perez-Garcia G, Gama Sosa MA, De Gasperi R, Tschiffely AE, McCarron RM, Hof PR, Gandy S, Ahlers ST, Elder GA. Blast-induced "PTSD": Evidence from an animal model. Neuropharmacology. 2019 Feb;145(Pt B):220-229. doi: 10.1016/j.neuropharm.2018.09.023. Epub 2018 Sep 15. Review. PubMed PMID: 30227150.

25.   Pooley AE, Benjamin RC, Sreedhar S, Eagle AL, Robison AJ, Mazei-Robison MS,Breedlove SM, Jordan CL. Sex differences in the traumatic stress response: therole of adult gonadal hormones. Biol Sex Differ. 2018 Jul 13;9(1):32. doi:10.1186/s13293-018-0192-8. PubMed PMID: 30001741; PubMed Central PMCID:PMC6043950.

26.   Perez-Garcia, G., De Gasperi, R., Gama Sosa, M.A., Perez, G.M., Otero-Pagan, A., Tschiffely, A., McCarron, R.M., Ahlers, S.T., Elder, G.A., Gandy, S., 2018a. PTSD related Behavioral Traits in a Rat Model of Blast-induced MTBI Are Reversed by GluR2/3 Receptor Antagonist BCI-838.Perez-Garcia et al. (2018).

27.  Schallert T, Lindner MD. Rescuing neurons from trans-synaptic degeneration after brain damage: helpful, harmful, or neutral in recovery of function?. Can J Psychol. 1990;44(2):276–292. doi:10.1037/h0084244

**Exhibit B**
**Budget**


The total agreed upon budget for the Project, including Institution's overhead, is US $1,624,476.00. The schedule of payments to the Institution will be according to the following schedule:

1st payment: US $324,895.20 due within 60 days of execution of this agreement by both parties.

2nd payment: US $324,895.20 due 3 months after the 1st payment.

3rd payment: US $324,895.20 due 3 months after the 2nd payment.

4th payment: US $324,895.20 due 3 months after the 3rd payment.

5th payment: US $324,895.20 due 3 months after the 4th payment.